# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

GREGORY JACKSON, §
§
Plaintiff, §
§
v. §   CIVIL ACTION NO. H-06-2920
§
HARINDAR SINGH, *et. al.,* §
§
Defendants. §

## MEMORANDUM AND RECOMMENDATION ON
## MOTIONS FOR SUMMARY JUDGMENT

This matter was referred by United States District Judge Lee H. Rosenthal for full pretrial management, pursuant to 28 U.S.C. § 636(b)(1)(A) and (B). (Docket Entry # 10). Pending before the court are cross-motions for summary judgment which were filed by Defendant City of Houston ("Defendant," "the City") and Plaintiff Gregory Jackson ("Plaintiff," "Jackson"). (Defendant City of Houston's Motion for Summary Judgment ["Defendant's Motion"], Docket Entry # 38; Plaintiff's Motion for Partial Summary Judgment Under FRCP 56 ["Plaintiff's Motion"], Docket Entry # 41). Defendant made a timely response to Plaintiff's Motion. (Defendant City of Houston's Response in Opposition to Plaintiff's Motion for Partial Summary Judgment ["Defendant's Response"], Docket Entry # 43). Plaintiff, after being granted leave to amend, filed a Second Amended Complaint. (Plaintiff's Second Amended Complaint–Jury Demand ["Second Amended Complaint"], Docket Entry # 52). Defendant then submitted a supplement to its original motion for summary judgment. (Defendants' Supplemental Motion for Summary Judgment ["Defendant's Supplemental Motion"], Docket Entry # 58).

After considering the pleadings and the applicable law, it is RECOMMENDED that Defendant's motion for summary judgment be **GRANTED**, and that Plaintiff's motion be **DENIED**.

**BACKGROUND**

Gregory Jackson, a former Assistant City Controller for the City of Houston, alleges that he was terminated from his employment in violation of a number of his constitutional and statutory rights.   Based on those allegations, Jackson filed suit against the City, as well as his former supervisors.[1]   From the record before the court, it appears that Jackson's complaints arise from the events which followed two employee "performance evaluations."

On March 14, 2005, Jackson's immediate supervisor, Harindar Singh ("Singh"), conducted an unscheduled evaluation of Jackson's performance.   (Plaintiff's Motion, Ex. 35). On March 17, 2005, Jackson sent an email to Singh and Sandra Zeno ("Zeno"),[2] expressing his frustration with the evaluation scores that he received.[3]   (*Id.*).   In this email, Jackson also discussed a previous evaluation, from January of 2004, in which he had received an unsatisfactory rating for "missing a deadline." (*Id.* at 3).   Jackson complained to Singh and Zeno that the "light or white individuals" who completed the same task within a similar time frame did not receive such unsatisfactory evaluation scores.   (*Id.*).

---

[1]   Plaintiff originally included the following City employees as defendants: City Controller Annise D. Parker; Finance and Administration Director Judy Gray Johnson; Deputy City Controller Mary Ann Grant; Deputy Director-Controller, Madeleine Appel; Division Manager Harindar Singh; and Senior Assistant City Attorney-Division Chief Constance Acosta. (*See* Plaintiff's Amended Complaint at ¶ 1, Docket Entry #19). Those individual defendants were dismissed on September 25, 2007. (*See* Order, Docket Entry #32).

[2]   Zeno's position with the City of Houston is unclear. However, from the record, it appears that she is an employee of the City Controller's Office. (*See* Appendix; Plaintiff's Motion, Ex. 35).

[3]   Although Jackson alleges that he sent this email to "each elected councilmember and to the Mayor's agenda director for the City of Houston City Council," it appears that he actually sent it only to Singh and Zeno. (*See* Plaintiff's Motion, Ex. 35).

On June 23, 2005, Singh again reviewed Jackson's work performance, this time for the period from July 1, 2004, through June 30, 2005. (Second Amended Complaint at ¶ 5). Although Singh rated Jackson's performance as "acceptable," he advised Plaintiff that he had the right to respond to the evaluation. (*Id.*). Jackson took the opportunity to do so, and he submitted a written response on July 7, 2005. (*Id.* at ¶ 6). In his response, Jackson not only discussed the ratings he received from Singh, but he addressed a number of other issues as well, including: (1) his complaints about "interpersonal communication" within the office. (Defendant's Motion, Ex. 2 at 4–7); (2) his concern that the City "was so ready to allow benefits to gay and lesbian couples," yet denied health benefits to Jackson's step-daughter after he divorced her mother. (*Id.* at 15–17); (3) his claims that the City's Office of the Controller and Office of Inspector General ("OIG") engaged in racially discriminatory practices (*Id.* at 9–14, 20–21); and (4) his concerns about the City's allegedly corrupt investigation into the Houston Police Department's crime lab. (*Id.* at 8–10).

Jackson alleges that, after receiving his response, Parker convened a meeting of her "executive level staff," including Deputy City Controller Mary Ann Grant, Deputy Director-Controller Madeleine Appel, and Singh, to consider whether his "lengthy non-job related comments" had violated a City policy. Plaintiff claims that, at this meeting, the staff also considered whether his "angry and intimidating demeanor" was "possibly associated with alcohol or drug abuse" which required "diagnosis and treatment for anger management exclusively at a drug and alcohol treatment facility." (*Id.* at ¶ 7). Jackson alleges that Constance Acosta, the legal division chief, informed Parker that Plaintiff's "speech" could not be used as a justification for treatment. (*Id.* at ¶ 9). Despite that purported warning, Jackson claims that

Parker "ordered" him to seek treatment for "anger management" from the Houston Council for Drug and Alcohol Abuse as a condition of his continued employment. (*Id.* at ¶ 8). Jackson also contends that Parker forced him to attend treatment in the hope that he would refuse to go, which would create "grounds for his termination." (*Id.* at ¶ 10).

Jackson's counseling sessions began in October 2005, and he claims that, during treatment, he was required to relinquish "individually identifiable health information" about private matters. (Second Amended Complaint at ¶¶ 14–15). Before releasing this information, however, he signed a consent form which assured him that his confidential information was "protected by federal privacy law." (*Id.* at ¶ 14). When Jackson finished the program, in December 2005, he received a "certificate of completion." (*Id.* at ¶ 15). Plaintiff alleges that, "[f]rom October 2005 through March 2006, none of the Defendants asked [him] about diagnosis and treatment," or sought his "certificate of completion." (*Id.*).

On March 27, 2006, Jackson filed a complaint with the Department of Labor, alleging that his supervisors had "demonstrated irregularities and inconsistent treatment" in approving his requested leave under the Family and Medical Leave Act ("FMLA"). (Second Amended Complaint at ¶ 16, 31, Ex. 5). Plaintiff claims that, when Parker learned of the Department of Labor complaint, she directed Singh to verify that Jackson had completed his required drug and alcohol counseling. (*Id.* at ¶ 18). Plaintiff claims that Singh then demanded that he submit his certificate of completion, which he refused to do. Because of his refusal, Defendants allegedly sought the certificate directly from the Houston Council for Drug and Alcohol Abuse and the City of Houston's Employee Assistance Program. (*Id.* at ¶ 19). Reportedly, those organizations, citing privacy laws, declined to divulge Plaintiff's medical information. (*Id.*). Jackson claims

4

that his supervisors then again requested the certificate from him, this time, threatening "adverse employment action," if he refused to provide it. (*Id.* at ¶ 20). Plaintiff again refused, and in June 2006, he was placed on indefinite suspension, with pay. (*Id.* at ¶ 21, 22). Jackson alleges that, in response to that suspension, he provided the City with his certificate of completion and "requested permission to return to work." (*Id.* at ¶ 23). Four days later, "Parker convened an indefinite suspension hearing," at which Jackson appeared with his attorney. (*Id.* at 24). Jackson states that,

> [d]uring the hearing, [he] noted that (1) his performance had been consistently acceptable since the early part of 2004, (2) there was no documented incident of any anger related issues in his file (no informal or formal counseling and no formal discipline of any kind), (3) he reasonably believed that the order was not justified (4) he had a reasonable expectation of privacy in the information **Parker** sought and (5) the **Parker** [sic] and her staff had no cause to insist upon the documents disclosure. [sic].

(*Id.*) (emphasis in original). Following the hearing, Parker terminated Jackson's employment with the City, effective July 3, 2006. (*Id.* at ¶ 25). On July 10, 2006, Jackson appealed his termination with the Civil Service Commission. (*Id.*). Jackson insists that he was terminated for a number of unlawful reasons. Among them are that: (1) he expressed public disagreement with Parker in his response to Singh's evaluation; (2) he refused to surrender his private medical information; (3) he filed a complaint with the Department of Labor about his FMLA requests; and (4) he informed his supervisors that he intended to file a HIPAA claim with the Secretary of Health and Human Services. (*Id.* at ¶ 29).

In his Second Amended Complaint, Jackson claims that he is entitled to relief under 42 U.S.C. § 1983 because he was wrongfully terminated from his City employment in violation of his right to free speech under the First Amendment to the United States Constitution. (Second

Amended Complaint at ¶¶ 3–10). He also alleges a second violation of 42 U.S.C. § 1983, based on the complaint that Parker and her staff violated his privacy rights under the Fourth Amendment to the United States Constitution by requiring him to undergo treatment, and by forcing him to divulge his medical information. (*Id.* at ¶¶ 11–25). And he seeks further relief under § 1983, for a purported violation of his Fourteenth Amendment right to equal protection. Finally, Jackson claims that the City violated Texas Government Code § 554.002(a), the "Whistleblower Act." (*Id.* at ¶¶ 29–41).

Through this suit, Jackson seeks a reinstatement to his former position as an Assistant City Controller, or an equivalent position, in addition to lost wages from July 3, 2006, including interest and benefits, as well as punitive damages, "(not less than $250,000)." (Second Amended Complaint at ¶ 43). In total, Jackson is requesting "compensatory and exemplary damages in the amount of $10,422,627.60, reasonable cost[s] and attorney fees." (*Id.*). He also requests that the treatment program "certificate of completion" be returned to him. (*Id.*). In response to these claims, Defendant argues that Jackson was not terminated in violation of any constitutional or statutory right. Instead, Defendant argues, Jackson was terminated because he was insubordinate and disrespectful toward his supervisors. For the reasons set out below, Defendant's motion for summary judgment should be **GRANTED**.

## STANDARD OF REVIEW

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits filed in support of the motion, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Morris v. Equifax Info. Servs., LLC,* 457 F.3d 460, 465 (5th Cir.2006) (citing *Young v. Equifax Credit Info. Servs., Inc.,* 294 F.3d 631, 635 (5th

Cir.2002)).   Under Rule 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Norman v. Apache Corp.*, 19 F.3d 1017, 1023 (5th Cir. 1994).   The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the non-movant's case.   *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).   If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the non-movant's response.   *Id.*   When the moving party has met its Rule 56 burden, the non-movant cannot survive a motion for summary judgment by resting merely on the allegations in it pleadings.   *McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995).   If the movant does meet his burden, the non-movant must go beyond the pleadings and designate specific facts to show that there is a genuine issue for trial.   *Little*, 37 F.3d at 1075.   Further, the non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts."   *Webb v. Cardiothoracic Surgery Assocs.*, 139 F.3d 532, 536 (5th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)).

To meet its burden, the nonmoving party must present "significant probative" evidence indicating that there are issues of fact remaining for trial.   *Conkling v. Turner*, 18 F.3d 1285, 1295 (5th Cir. 1994).   In deciding a summary judgment motion, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [his] favor."   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   However, "Rule 56 mandates the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who

fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Little*, 37 F.3d at 1075.  If the evidence presented to rebut the summary judgment motion is only colorable or not significantly probative, summary judgment should be granted.  *Anderson*, 477 U.S. at 249–50.

## DISCUSSION

Jackson has invoked 42 U.S.C. § 1983 in an attempt to impose liability on the City for his claims under the First, Fourth, and Fourteenth Amendments to the U.S. Constitution. Section 1983 provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.  Indeed, § 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights that are conferred elsewhere.  *See Albright v. Oliver*, 510 U.S. 266, 271 (1994).  But to establish liability under § 1983, a civil rights plaintiff must make a showing on two elements: (1) state action; that is, that the complained of conduct was committed under color of state law, and (2) a resulting violation of federal law.  Put simply, the offending conduct must have deprived the plaintiff of rights secured by the Constitution or laws of the United States.  *See Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992); *Baker v. McCollan*, 443 U.S. 137, 142 (1979).

Municipal Liability – Section 1983 Claims against the City of Houston

It is well settled that municipalities are deemed to be "persons" subject to suit under §1983.  *See Monell v. Dep't of Soc. Serv. of City of New York*, 436 U.S. 658, 690 n.55 (1978).

8

In his claims under the First, Fourth, and Fourteenth Amendments, Jackson seeks to hold the City liable for the alleged constitutional violations by its employees.   However, municipal liability for actions by an employee cannot be sustained merely under a theory of *respondeat superior* or vicarious liability. *Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 403 (1997).   Instead, "the unconstitutional conduct must be directly attributable to the municipality through some sort of official action or imprimatur[.]"   *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001).   To establish a § 1983 claim against a municipality, the plaintiff must allege that the violation of a federally protected right resulted from the execution of a policy or custom adopted by that body's responsible policy makers. *Monell*, 436 U.S. at 691; *Mack v. City of Abilene*, 461 F.3d 547, 556 (5th Cir. 2006).   The essential elements of municipal liability under § 1983 include the following: a policymaker, and an official policy or custom which is the "moving force" behind a violation of constitutional rights. *Piotrowski*, 237 F.3d at 578 (citing *Monell*, 436 U.S. at 694).

In his most recent Complaint, Jackson identifies Parker as the "policymaker," who, "using her separate and distinct policy making authority," in the City Controller's office, terminated his employment because he "did not immediately comply with [her] newly implemented policy." (Second Amended Complaint at ¶ 3).   From a liberal construction of the Complaint, it appears that Jackson is complaining of a "policy," which Parker allegedly designed to force an employee to undergo treatment for "anger management attributable to drug and alcohol abuse" if he expresses views in opposition to those of "Parker and/or her administration," and to punish employees for expressing those views.   (*Id.*).   As a corollary to that "forced" treatment and alleged retaliation, Jackson also complains about the "policy"

9

requiring him to divulge his treatment records. (*Id.* at ¶ 12). In response to this contention, Defendant argues that Plaintiff is unable to show that the complained of action was an "official policy" for the purposes of municipal liability. (Defendant's Motion at ¶ 15).

> Under § 1983, an "official policy" is either,
>
> a policy statement, ordinance, regulation, etc., that has been officially adopted by a policymaker, or a persistent, widespread practice of officials or employees, which although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents the municipality's policy.

*Cox v. City of Dallas, Tex.*, 430 F.3d 734, 748 (5th Cir. 2005) (quotation and citation omitted). Here, there is no evidence that Parker implemented a policy, official or otherwise, that required employees to undergo treatment for anger management for expressing views in opposition to hers. Nor is there any evidence of a persistent, widespread practice or custom to that effect. In fact, Plaintiff has presented no evidence that Parker ever instructed any employee other than himself to attend an anger management course. "[O]ne act itself is not a custom. There must be a persistent and widespread practice." *Pineda v. City of Houston*, 291 F.3d 325, 329 (5th Cir. 2002) (citing *Piotrowski*, 237 F.3d at 581). It seems then, that Parker's alleged "policy" is more appropriately characterized as a single decision by an official. It has been held, however, that even "a single decision by an official can be grounds for [§] 1983 liability where the decision was rendered by an individual with 'final policymaking authority.'" *Gelin v. Hous. Auth. of New Orleans*, 456 F.3d 525, 527 (5th Cir. 2006) (citing *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)). But, in those instances, the relevant "official must also be responsible for establishing final government policy respecting such activity before the [city] can be held liable." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 482–83 (1986); *see also City of St. Louis*

*v. Praprotnik*, 485 U.S. 112, 127 (1988); *Worsham v. City of Pasadena*, 881 F.2d 1336, 1340 (5th Cir. 1989) ("[N]o matter how much power an official has, no municipal liability exists if that official does not set the policy at issue . . . the employee must have final policymaking authority in that area."). Whether an official has final policymaking authority is a question of state law. *Praprotnik*, 485 U.S. at 123 (quoting *Pembaur*, 475 U.S. at 483). Defendant argues that Jackson has failed to provide any evidence that Parker is a "policymaker" for the purposes of § 1983. (Defendant's Motion at ¶ 15).

In the present case, Parker is "the elected City Controller . . . and served as the Department Director of the Office of the City Controller" during Jackson's employment and termination. (*See* Defendant's Motion, "Parker Affidavit"). As such, there is some evidence in the record to suggest that Parker may have the necessary authority to bind the City in some areas. In its answer to Plaintiff's interrogatories, the City stated that, as Controller, Parker "set the administrative policies" for the City Controller's Office. (Plaintiff's Motion, Ex. 1 at No. 2). On the other hand, there has been no evidence presented on whether her authority on administrative policies is final or is subject to review. *See Worsham*, 881 F.2d at 1340–41 (holding that a city official is not a "final policymaker" if her decisions are subject to "meaningful review by the City Council."). On this record, then, it is unclear whether Parker's authority to "set the administrative policies" for the Controller's Office constitutes "final policymaking authority" for the purposes of § 1983. For that reason, summary judgment for the City on that issue is not justified. Further, given Plaintiff's pro se status, and in an abundance of caution, it is appropriate to address the remainder of Defendant's arguments on the merits of Jackson's claims.

### Claim under the First Amendment

Jackson alleges that the City violated his rights under the First Amendment to the Constitution, because Parker, acting in her official capacity, terminated him in retaliation for his exercise of his right to free speech. Jackson complains that he was terminated because he expressed views adverse to those of the Controller's Office in his email to Singh and Zeno [his "email"], his response to his June 2005 employee performance evaluation ([the "EPE reply,"], which is attached as an appendix to this memorandum), and in his complaint to the Department of Labor [his "complaint"].[4]   (Second Amended Complaint at ¶¶ 4, 10).   Defendant argues that Plaintiff's retaliation claim fails for a number of reasons, but most particularly because Jackson was speaking as an employee, not as a citizen, when he engaged in the allegedly protected speech. (Defendant's Motion at ¶¶ 17, 21–22).

It is well established that "public employees do not surrender all their free speech rights by reason of their employment." *Jordan v. Ector County*, 516 F.3d 290, 294–95 (5th Cir. 2008) (quoting *Garcetti v. Ceballos*, 547 U.S. 410 (2006)); *Williams v. Dallas Indep. Sch. Dist.*, 480 F.3d 689, 691 (5th Cir. 2007). However, in a recent decision, the United States Supreme Court held that for an employee's speech "to qualify for First Amendment protection, he must be speaking 'as a citizen on a matter of public concern.'" *Garcetti*, 547 U.S. at 418. "[B]efore asking whether the subject-matter of particular speech is a topic of public concern, the court must decide whether the plaintiff was speaking 'as a citizen' or as part of [his] public job."

---

[4]  In his Second Amended Complaint, Plaintiff did not include an allegation based on his complaint to the Department of Labor, however, he did testify that he was terminated in retaliation for that action. (Defendant's Motion, "Jackson Deposition Excerpts" at 66–67). The court applies "less stringent standards to parties proceeding pro se than to parties represented by counsel and liberally construe[s] the briefs of pro se litigants." *Sanders v. Barnhart*, 105 Fed. Appx. 535, 536 (5th Cir. 2004) (citing *Grant v. Cuellar*, 59 F.3d 523, 524 (5th Cir. 1995); *Yohey v. Collins*, 985 F.2d 222, 225 (5th Cir.1993))

*Davis v. McKinney*, 518 F.3d 304, 312 (5th Cir. 2008) (quoting *Mills v. City of Evansville*, 452 F.3d 646, 647–48 (7th Cir. 2006). In *Garcetti v. Ceballos*, the Court ruled that "[a]n employee is not speaking as a citizen – but rather in his role as an employee – when he 'make[s] statements pursuant to [his] official duties.'" *Nixon v. City of Houston*, 511 F.3d 494, 497 (5th Cir. 2007) (quoting *Garcetti*, 547 U.S. at 421). "Only when government penalizes speech that a plaintiff utters 'as a citizen' must the court consider the balance of public and private interests, along with the other questions posed by *Pickering* and its successors, such as *Waters v. Churchill*, 511 U.S. 661(1994); *Connick v. Myers*, 461 U.S. 138 (1983); and *Givhan v. W. Line Consolid. Sch. Dist.*, 439 U.S. 410 (1979)." *Davis*, 518 F.3d at 312 (quoting *Mills*, 452 F.3d at 647–48). In light of *Garcetti*, the Fifth Circuit has clarified the test that a court should use to determine whether a public employee's speech is constitutionally protected:

> The inquiry whether the employee's speech is constitutionally protected involves three considerations. First it must be determined whether the employee's speech is pursuant to his or her official duties. If it is, then the speech is not protected by the First Amendment. Second, if the speech is not pursuant to official duties, then it must be determined whether the speech is on a matter of public concern. Third, if the speech is on a matter of public concern, the *Pickering* test must be applied to balance the employee's interest in expressing such a concern with the employer's interest in promoting the efficiency of the public services it performs through its employees. (Footnotes and citations omitted).

*Id.* (quoting Ronna Greff Schneider, 1 Education Law: First Amendment, Due Process and Discrimination Litigation § 2:20 (West 2007)). Finally, to prevail on a retaliation claim under the First Amendment, the plaintiff must show not only that his speech is protected, but also that his speech was a "substantial or motivating factor" behind the employer's decision to terminate his employment. *Nixon*, 511 F.3d at 497; *see Alexander v. Eeds*, 392 F.3d 138, 142 (5th Cir. 2004).

13

As to the first consideration, the Fifth Circuit has established that "[a]ctivities undertaken in the course of performing one's job are activities pursuant to official duties and not entitled to First Amendment protection." *Davis*, 518 F.3d at 313.  *See, e.g., Williams*, 480 F.3d at 694 (holding that an athletic director's memo requesting information about the use of athletic funds was not protected speech because the information was needed to perform "daily operations" as athletic director); *Nixon*, 511 F.3d at 498–99 (holding that a police officer's statement to the media was "made pursuant to his official duties[, because] speaking to the media is arguably one of an officer's job responsibilities").  However, even if the speech at issue is not required by the employee's job, the speech may not be protected if it was made while performing the job or to fulfill the job's responsibilities. *See Williams*, 480 F.3d at 694.  A formal job description is not dispositive in determining whether the employee spoke pursuant to his official duties. *Williams*, 480 F.3d at 692 "[N]or is speaking on the subject matter of one's employment." *Id.*  It is important to note, as well, that the Fifth Circuit has recognized that "when a public employee raises complaints or concerns up the chain of command at his workplace about his job duties, that speech is undertaken in the course of performing his job." *Davis*, 518 F.3d at 313; *see id.* at 313 n.3 ("the caselaw is unanimous in holding that employee's communications that relate to his own job function up the chain of command, at least within his own department or division, fall within his official duties and are not entitled to First Amendment protection").  On the other hand, if a public employee "takes his job concerns to persons outside the work place in addition to raising them up the chain of command at his workplace, then those external communications are ordinarily not made as an employee, but as a citizen." *Id.*

In this case, the threshold question is whether Jackson spoke as a citizen or as an employee, pursuant to his official duties, in the communications at issue. Just recently, in *Davis v. McKinney*, the Fifth Circuit held that if a plaintiff's claim is based on multiple communications with multiple recipients, the court should divide the speech by topic and analyze each component separately. *Davis*, 518 F.3d at 314 (citing *Freitag v. Ayers*, 468 F.3d 528 (9th Cir. 2006)). The Fifth Circuit found support for its holding in "[p]re-*Garcetti*" case law, which "supports analyzing mixed speech in a single communication by dividing the communication by topic and applying the First Amendment analysis to each topic separately." *Id.* (citing *Connick*, 461 U.S. at 141).

Here, there is little question that Jackson spoke as an employee in discussing his performance evaluation scores and "interpersonal communication" issues in his EPE reply and in his email to his supervisors. (Appendix at 2–5; Plaintiff's Motion, Ex. 35 at 2–3). These issues were clearly addressed within the context of a discussion of his job duties. In fact, Jackson subtitled one portion of his EPE reply as "Job duty section." (Appendix at 2). Further, Plaintiff admitted that he submitted the EPE reply "as part of [his] responsibility as Assistant City Controller V." (Defendant's Motion, "Plaintiff's Answers to [Request for Admissions]" at No. 80). It is also significant that Jackson directed these job-related concerns "up the chain of command at his workplace" to his immediate supervisor, Singh, and to another City employee, Zeno. *See Davis*, 518 F.3d at 313 n.3. Because Jackson spoke as an employee and not as a citizen, his speech regarding his evaluation scores and office communication issues is not protected by the First Amendment. *See Nixon*, 511 F.3d at 498; *Williams*, 480 F.3d at 694.

But, it is not clear, from this record, whether Jackson spoke as a citizen or as an employee when he addressed the remaining topics in his EPE reply. There is very little evidence in the record regarding the scope of Jackson's duties as an Assistant City Controller, other than that he was an accountant and a "high level supervisor[]." (Defendant's Motion, Ex. 1 at 1). It is arguable, therefore, whether Jackson's concerns about the OIG's investigations, alleged racism in the Office of the Controller, and the City's benefits plans would be related to any duty that he had as an Assistant City Controller. Because the record is unclear on the precise nature of those duties, the court will assume, for these purposes, that Jackson spoke as a citizen with respect to those issues.

Because Jackson's cited speech covered multiple topics and was directed to recipients outside the Controller's Office, the court must determine whether he raised issues of public concern, when he spoke "as a citizen." *See Davis*, 518 F.3d at 316–17. Any communications that Jackson made as a citizen undoubtedly qualify for First Amendment protections if they raise a matter of public concern. *See Davis*, 518 F.3d at 316. "Matters of public concern are those which can be fairly considered as relating to any matter of political, social, or other concern to the community." *Alexander*, 392 F.3d at 142 (citing *Branton v. City of Dallas*, 272 F.3d 730, 739 (5th Cir. 2001)). The Fifth Circuit has found that in those instances in which the content of an employee's speech pertains to internal disputes and working conditions, such speech will not ordinarily involve matters of public concern. *Id.* The courts do not "presume that all matters which transpire within a government office are of public concern," and "the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs." *Commc'n Workers of Am. v. Ector County Hosp. Dist.*, 467 F.3d 427, 438 (5th

Cir. 2006) (quoting *Connick*, 103 U.S. at 149)).   However, even if the employee's speech contains an element of his personal interest, the court may still find "that the speech as a whole raises issues of public concern." *Modica v. Taylor*, 465 F.3d 174, 180 (5th Cir. 2006).   "Whether an employee's speech addresses a matter of public concern must be determined from the content, form, and context of a given statement." *Charles*, 522 F.3d at 514 (quoting *Connick*, 461 U.S. at 147–48).

Jackson's complaint to the DOL did not address a matter of public concern.   In that complaint, Jackson raised only his contention that the City had improperly denied his requests for leave under the FMLA.   (Second Amended Complaint, Ex. 5).   Jackson did not use the complaint to discuss any other issues or grievances, but merely to pursue his private dispute with the City.   Clearly then, the complaint to the DOL is not protected by the First Amendment. *See Ayoub v. Texas A & M Univ.*, 927 F.2d 834, 837–38 (5th Cir.1986), *cert. denied*, 479 U.S. 1064, 107 S.Ct. 948 (1987) (holding that an employee's EEOC charge that addressed "only his personal employment conditions" was not protected speech under the First Amendment).

In his EPE reply, Jackson expressed his frustration over the City's denial of health benefits to his step-daughter following his divorce from her mother.   (Appendix at 15–17). Jackson claimed that this action was unfair, because the City was allegedly considering a change to its policy to allow benefits for same-sex partners of employees.   (*Id.*).   In the same context, Jackson discussed his approval of a proposal to "pass a constitutional amendment that will cement the original intent for marriage into [Texas] law." (Appendix at 16).   Speech on a matter of public concern does not involve "solely personal matters." *Kennedy v. Tangipahoa Parish Lib. Bd. Of Control*, 224 F.3d 359, 372 (5th Cir. 2000) (citing *Wilson v. UT Health Ctr.*, 973

F.2d 1263, 1269 (5th Cir.1992)).   The content of the speech may be public in nature "[i]f releasing the speech to the public would "inform the populace of more than the fact of an employee's employment grievance," and if the speech was not "in furtherance of a personal employer-employee dispute." *Kennedy*, 224 F.3d at 372.   Speech on a matter of public concern "need not be made before a public audience, although 'it may relate to the public concern if it is made against the backdrop of public debate.'" *Salge v. Edna Indep. Sch. Dist.*, 411 F.3d 178, 187 (5th Cir. 2005) (quoting *Kennedy*, 224 F.3d at 372).

Here, Jackson's complaint regarding the denial of health benefits to his step-daughter again concerned only a private dispute he had with the City.   While his comment on the City's consideration of same-sex benefits and his personal disagreement with management policy may touch upon matters of public concern, he did not make these comments "against the backdrop of public debate," but instead included them in his EPE reply, apparently to further his argument that his step-daughter was wrongly denied health benefits.   On this record, then, the court concludes that Jackson's speech regarding the City's health benefits does not involve a matter of public concern.

Jackson also referenced alleged misconduct by City officials and racial discrimination within the Office of the City Controller in his EPE reply and in his email.   It is "well-established . . . that speech relating to official misconduct or racial discrimination almost always involves matters of public concern." *Charles*, 522 F.3d at 514 (citing *Wallace v. County of Comal*, 400 F.3d 284, 289–91 (5th Cir. 2005) ("[T]here is perhaps no subset of matters of public concern more important than bringing official misconduct to light."); *Kinney v. Weaver*, 367 F.3d 337, 369 (5th Cir. 2004) ("[I]t is well-established in the jurisprudence of both the Supreme Court and

this court that official misconduct is of great First Amendment significance."); *Victor v. McElveen*, 150 F.3d 451, 456 (5th Cir.1998) (plaintiff's speech "was inherently of public concern because it was a protest against racial discrimination") (additional citations omitted).

In his EPE reply, Jackson suggested that the City's OIG discriminated against him because of his race during an investigation into his claim that he was assaulted by a coworker. (Appendix at 9–10). Jackson also alleged that the Office of the Controller is full of "covert extremists" that "practice their notion of supremacy in the workplace." (*Id.* at 11). He further stated that the Controller's administration "won't tolerate intelligent, moral and ethical black men that exercise independent thought this [sic] diverge from their own" and that it prefers to hire only "conditioned black men and women who will sacrifice professional ethics and withhold simple courtesy from unconditioned blacks." (*Id.* at 20). In addition, Jackson made allusions to the alleged corruption in the City's investigation into the Houston Police Department's crime lab. (*Id.* at 8–10; Plaintiff's Motion, Ex. 35 at 3). To the extent that Jackson's statements can be seen to discuss issues of official misconduct and racial discrimination, rather than his personal grievances against his employer, that speech arguably raises a "matter of public concern." *See Charles*, 522 F.3d at 515; *see also Victor*, 150 F.3d at 456.

Because several topics of Jackson's EPE reply touched on matters of public concern, the court must apply the *Pickering* test "to balance the employee's interest in expressing such a concern with the employer's interest in promoting the efficiency of the public services it performs through its employees." *Davis*, 518 F.3d at 312 (quoting *Mills*, 452 F.3d at 647–48)). To do so, the court must weigh "the employee's interest, as a citizen, 'in commenting on matters of public concern'" with "the interest of the government employer 'in promoting the efficiency

of the public services it performs through its employees.'" *Id.* (quoting *Pickering*, 391 U.S. at

568).   To determine whether Jackson's speech burdened the City's interests, the court must

consider whether Jackson's speech

> impairs discipline by superiors or harmony among coworkers, has a detrimental
> impact on close working relationship for which personal loyalty and confidence
> are necessary, or impedes the performance of the speaker's duties or interferes
> with the regular operation of the enterprise.

*Salge*, 411 F.3d at 192 (quoting *Rankin v. McPherson*, 483 U.S. 378, 388 (1987)).   An employer

has the onus to show that its interests outweigh the interests of its employee. *Connick*, 461 U.S.

at 150.

Defendant argues that "Jackson's speech characterizing his supervisors, executive staff

and others he worked with daily, as covert extremists, white supremacists, can be nothing short

of divisive, disruptive and detrimental to the harmonious and efficient operation of the

Controller's Office."  (Defendant's Motion at  ¶ 26).  Further, Defendant argues, "the speech

could serve only to adversely affect those working relationships between Jackson and the people

in the Controller's office with whom [Jackson] worked." (*Id.*).  Indeed, it is certainly reasonable

to expect that Jackson's accusation that his co-workers are "covert extremists" may disrupt the

"harmonious" working environment in the Controller's Office. *See Nixon*, 511 F.3d at 499 n.8

("[A] government employer need not produce evidence of actual harm or disruption to

government operations . . . . [C]ourts have given 'substantial weight to government employer's

reasonable predictions of disruptions.'") (quoting *Waters v. Churchill*, 511 U.S. 661, 673

(1994)).

However, the City failed to address several other aspects of Jackson's speech, including

the comments that the City's OIG discriminated against him because of his race, that the

administration of the Office of the Controller prefers to hire only certain types of African Americans, and that the City's investigation into the Houston Police Department's crime lab was corrupt. Because the City did not address these other topics, the City has not met its burden to show that its interests outweigh Jackson's interests in speaking as a citizen on matters of public concern. *See Connick*, 461 U.S. at 150. For that reason, the court must continue to determine whether Jackson's speech was a "substantial or motivating factor" behind the City's decision to terminate his employment. *Nixon*, 511 F.3d at 497.

Here, Defendant has presented significant, unrebutted proof that its decision to terminate Plaintiff was not motivated by the speech at issue, but rather was based solely on his "flagrant insubordination and the continued disrespect directed at supervisors and executive staff in the Controller's Office." (Defendant's Motion at ¶ 29, Ex. 1 at 1). Indeed, the evidence shows that Jackson repeatedly refused to comply with the directives of his supervisors. First, Jackson missed a deadline to enroll in a required anger management course, and "used every means to delay taking the course." (Defendant's Motion, Ex. 1 at 1). Then, after Jackson completed the course, he repeatedly refused to provide his supervisor with any proof of his attendance. (*Id.*). From the record, Plaintiff does not controvert in any way Defendant's version of events. Nor has he offered any evidence that would create an issue of fact in light of Defendant's evidence that his termination was based on insubordination. Because Plaintiff has failed to raise a genuine issue of material fact on whether his protected speech, if any, was a "substantial or motivating factor" in his termination, it is recommended that Defendant's motion as to Jackson's First Amendment claims be granted.

*Claim under the Fourth Amendment*

Jackson further alleges that Parker, Appel and Singh utilized another of Parker's "policies" which "required [him] to relinquish by threat/coercion his general right to privacy." (Second Amended Complaint at ¶ 12). He claims, in particular, that this policy forced him to "relinquish" his "individually identifiable health information obtained and compiled by [the] Houston Council for Drug and Alcohol Abuse." (*Id.* at ¶ 11). Jackson invokes his Fourth Amendment "right of privacy," and argues that he had "a reasonable expectation of privacy with respect to the counseling and any document or record compiled from his patient records." (*Id.* at ¶ 13).

"The touchstone of Fourth Amendment analysis is whether a person has a 'constitutionally protected reasonable expectation of privacy.'" *California v. Ciraolo*, 476 U.S. 207, 211 (1986) (quoting *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring)); *see also Smith v. Maryland*, 442 U.S. 735, 740 (1979) ("[T]his Court uniformly has held that the application of the Fourth Amendment depends on whether the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action."). The Fifth Circuit has stated that, in making a privacy claim under the Fourth Amendment, a plaintiff

> must demonstrate both that [he] had an actual expectation of privacy, based on a showing that [he] sought to preserve something as private (which is called a subjective expectation of privacy), and that [his] expectation of privacy is one that society recognizes as reasonable (which we call an objective expectation of privacy).

*Zaffuto v. City of Hammond*, 308 F.3d at 485 (5th Cir. 2002) (quoting *Kee v. City of Rowlett*, 247 F.3d 206, 212 (5th Cir. 2001).

In the present case, Defendant argues that Jackson did not have "any subjective or objective expectation of privacy with respect to the 'completion certificate.'" (Defendant's Motion at ¶ 32). To determine whether Jackson had such a subjective expectation, the court must consider whether the individual, "by his conduct, has exhibited an actual expectation of privacy; that is, whether he has shown that he [sought] to preserve [something] as private." *Kee*, 247 F.3d at 212 (quoting *Bond v. United States*, 529 U.S. 334, 338 (2000)). Here, Jackson repeatedly refused to submit the certificate, claiming that the City was attempting to invade his privacy. On five separate occasions, Jackson's supervisor requested that he provide confirmation that he had attended the anger management course. (*See* Defendant's Motion, Ex. 1 at 2). Jackson refused each request. *Id.* On June 2, 2006, Singh gave Jackson a final opportunity to submit the certificate "without repercussions." (*Id.*). In response, on June 12, 2006, Jackson sent Singh the following email, styled "In response to your continued attempts to invade my privacy":

> I have absolutely no intention of communicating either my attendance or none [sic] attendance of the subject treatment program. For reasons previously stated and others, I intend to pursue this and any auxilliary [sic] matters within the city grievance and with federal and other authorities up to and including amending my current complaint with the U.S. Department of Labor [adding Haridar [sic] Singh, Lloyd Waguespack and Controller Anise [sic] Parker - negligent supervision] and submitting the matter to Department of Health and Human Services.
>
> I do not need until 5:00 p.m. today. My position has not change. [sic]

(*Id.*, Ex. 4). On June 22, 2006, after he was relieved of his duties, Jackson submitted a copy of the certificate. (*Id.*, Ex. 5). On this record, it appears that Jackson actively "sought to preserve" the "certificate of completion" as private.

But, in addition to a subjective expectation of privacy, Jackson must also establish an objective expectation of privacy to prevail on his Fourth Amendment claim.   An objective expectation of privacy is "one that society is prepared to recognize as reasonable." *Kee*, 247 F.3d at 212 (quoting *Bond*, 529 U.S. at 338)).   Jackson argues that his expectation of privacy is reasonable, because the "certificate of completion" contains "individually identifiable health information."   (Second Amended Complaint at ¶ 19).   The document itself, however, belies this contention.   The certificate contains only the following information: (1) Jackson's first and last name; (2) the course name; (3) the date on which Jackson completed the course; (4) the instructor's name; (5) the number of "[e]ducation [h]ours"; (6) the name of the "Manager of Education Services"; and (7) the Council on Alcohol and Drugs Houston's logo and contact information. (Defendant's Motion, Ex. 5).   The certificate does not disclose any details regarding Jackson's treatment, nor does it contain any "individually identifying health information."   In fact, the certificate does not include any information that the City had not already ascertained. Further, Jackson testified that he was aware, before he attended the course, that he would be required to document his enrollment.   (*Id.*, "Jackson Deposition Excerpts" at 80, lines 2–12). Because there is no evidence in the record to support Plaintiff's claim that his expectation of privacy was reasonable, Defendant's motion for summary judgment on this claim should be granted.

### *Claim under the Fourteenth Amendment*

Finally, Plaintiff alleges that Defendant violated his right to equal protection under the Fourteenth Amendment.   (Second Amended Complaint at ¶¶ 26–28).   On that claim, he appears to cite another "policy" that Parker enacted, alleging that "**Parker**, exercising her independent

24

policy maker authority, systematically singled out **Jackson**, a black male, and required forced diagnosis and treatment as a condition of continued employment . . . ." (Second Amended Complaint at ¶ 26). He alleges further that "**Parker** did not require any other employee, whether similarly classified to Jackson, to attend the diagnosis and treatment program . . . ." (*Id.*). Although Jackson identifies himself as a "black male," he does not state explicitly that any of Parker's actions were taken because of his race. From the allegations that Parker "singled out" Jackson, from among other employees who had also expressed "inappropriate verbal and physical behavior," it is reasonable to infer an allegation that this treatment was due to his race. (*Id.* at ¶ 26).

As the Fifth Circuit has observed, "The Equal Protection Clause 'is essentially a direction that all persons similarly situated should be treated alike.'" *Brennan v. Stewart*, 834 F.2d 1248, 1257 (5th Cir. 1988) (citing *City of Cleburne, Texas v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). A "violation of equal protection occurs only when the government treats someone differently than others similarly situated." *Brennan*, 834 F.2d at 1257. To state a claim of racial discrimination under the Equal Protection Clause and § 1983, the plaintiff must allege and prove the following matters: (1) "that he received treatment different from that received by similarly situated individuals," and (2) "that the unequal treatment stemmed from a discriminatory intent." *Priester v. Lowndes County*, 354 F.3d 414, 424 (5th Cir. 2004) (quoting *Taylor v. Johnson*, 257 F.3d 470, 473 (5th Cir. 2001)). A plaintiff's personal belief that he was subjected to discrimination, however genuine that belief may be, cannot form the basis for judicial relief. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir.1996) (citing *Hornsby v. Conoco, Inc.*, 777 F.2d 243, 247 (5th Cir.1985)).

Here, Defendant argues that Jackson is "unable to prove that he has been treated differently than other similarly classified or situated employees." (Defendant's Motion at ¶ 40). Indeed, Jackson has not adduced any evidence that he was treated differently from other similarly situated individuals. Nor is there any evidence that Parker acted with discriminatory intent when she instructed Jackson to attend the anger management course. Because there is no evidence that raises a genuine issue of material fact on any element of an equal protection claim, Defendant is entitled to summary judgment on that allegation.

The Whistleblower Act

In his Second Amended Complaint, Plaintiff added a cause of action under § 554.002(a) of the Texas Government Code, the "Whistleblower Act" (the "Act"). (Second Amended Complaint at ¶ 29). The Texas Whistleblower Act prohibits state and local government employers from taking adverse personnel actions against employees who, in good faith, report violations of law to an appropriate law enforcement authority. Tex. Gov't Code §§ 554.001–554.010; *Montgomery County v. Park,* 246 S.W.3d 610, 612 (Tex. 2007). Plaintiff claims that he was terminated because he filed a complaint with the Department of Labor and threatened to report the City's alleged HIPAA violations to the United States Department of Health and Human Services. (*Id.*).

Defendant argues, first, that Plaintiff's claim is barred by the statute of limitations under the Texas Whistleblower Act.[5] (Defendant's Supplemental Motion at 5–7). However, Rule 8(c) of the Federal Rules of Civil Procedure "characterizes a statute-of-limitations defense as an affirmative defense that is waived unless pleaded by the defendant." *Davis v. Huskipower*

---

[5] The Act requires an employee to bring a claim "not later than the 90th day after the date on which the alleged violation of this chapter: (1) occurred; or (2) was discovered by the employee through reasonable diligence." Tex. Gov't Code § 554.005.

*Outdoor Equip. Corp.*, 936 F.2d 193, 198 (5th Cir. 1991) (citing FED. R. CIV. P. 8(c)).  Because the City failed to raise this defense in its pleadings, it has been waived.  *See id*; Defendant's First Amended Answer.

Defendant next argues that Plaintiff failed to satisfy the statutory prerequisites for asserting a claim under the Act.  (Defendant's Supplemental Motion at 6–7).  Before filing suit, the Act requires a public employee to "initiate action under the [employer's] grievance or appeal procedures...relating to suspension or termination of employment or adverse personnel action...."  *Id.* §554.006(a).  Although the Act clearly requires a plaintiff to "initiate action under the grievance or appeal procedures" before filing a lawsuit, it is not clear whether the plaintiff must specifically notify the employer of a whistleblower claim during those grievance procedures.  Here, Defendant argues that Jackson did not initiate the appropriate grievance procedure because he never notified the City of his whistleblower claim.  (Defendant's Supplemental Motion at 6).  Indeed, Jackson expressly denied, in his civil service appeal, that the adverse action was "taken against him in retaliation for reporting a violation of the law to an appropriate law enforcement agency."  (*Id.*, Ex. 1 at 8).  Defendant contends that, "if Jackson would have stated that he believed the adverse employment action had been taken in retaliation for reporting illegal activity, Jackson would have been referred to the Office of the Inspector General (OIG), who is charged with investigating whistleblower complaints."  (Defendant's Supplemental Motion at 7).

In *City of Houston v. Cotton*, 31 S.W.3d 823 (Tex. App.– Houston [1st. Dist.] 2000), the court addressed a similar argument.  There, the City argued that the plaintiff failed to initiate the proper grievance procedures because she did not raise her whistleblower claim with the OIG before filing suit.  *Cotton*, 31 S.W.3d at 824.  The Texas appellate court rejected the City's argument, holding that the plaintiff had satisfied the statutory requirement when she filed an

appeal with the Civil Service Commission.  *Id.* at 825.  In *Cotton*, however, the plaintiff had informed the City of her whistleblower claim during the hearing on her appeal.  *Id.* At 824. Here, although Jackson likewise filed an appeal with the Civil Service Commission, he never specifically disclosed his whistleblower claims.  The law is unclear on whether the Act requires Jackson to notify the City that he had a whistleblower claim, in addition to appealing his termination, before filing suit.  However, because the record does not support a claim under the Whistleblower Act, the court need not decide whether Plaintiff satisfied the Act's administrative prerequisites.

Assuming, without deciding, that Plaintiff satisfied the Act's requirements, Plaintiff has failed to raise any fact issue which would preclude summary judgment on his claim.  The Whistleblower Act provides:

> A state or local governmental entity may not suspend or terminate the employment of ... a public employee who in good faith reports a violation of law by the employing governmental entity or another public employee to an appropriate law enforcement authority.

Tex. Gov't Code Ann. § 554.002(a).  To establish a claim, "an employee must demonstrate that (a) the employee reported an alleged violation of law to an appropriate law enforcement authority; (b) the employee made the report in good faith; (c) the employer took an adverse employment action against the employee because the employee made the report; and (d) the employer's action proximately caused the employee's injuries."  *Forsyth v. City of Dallas*, 91 F.3d 769, 775 (5th Cir. 1996) (citing *Wichita County v. Hart*, 892 S.W.2d 912, 920–24 (Tex. App.– Austin 1994), *reversed on other grounds*, 917 S.W.2d 779 (Tex. 1996)).

An employee can recover under the Whistleblower Act only if he proves that he was suspended, terminated, or discriminated against *because* he reported a violation of the law in

good faith to an appropriate law enforcement authority. *Tex. Dep't Of Human Servs. Of Tex. v. Hinds*, 904 S.W.2d 629, 632–33 (Tex. 1995) ("[T]he standard of causation in whistleblower . . . cases should be that the employee's protected conduct must be such that, without it, the employer's prohibited conduct would not have occurred when it did."). It is an affirmative defense that the employer would have taken the adverse employment action "based solely on information, observation, or evidence that is not related to the fact that the employee reported a violation of law. Tex. Gov't Code Ann. § 554.004(b).

In the present case, Plaintiff alleges that:

> [o]n June 19, 2006, Defendant's policymaker Parker, already aware of Jackson's pending complaint with the U.S. Department of Labor, placed Jackson on administrative leave (suspension with pay) and began proceedings to indefinitely suspend/terminate Jackson . . . for <u>filing</u> a formal complaint with the United States Department of Labor and . . . for <u>advising</u> Defendant's policymaker Parker and employees Singh and Acosta that he intended to report what he reasonably believed to be violations of federal statutes HIPPA [sic] and FMLA by (a) <u>filing</u> a compliant with the Secretary of Health and Human Services and (b) <u>amending</u> his already pending complaint with the U.S. Department of Labor for harassment and retaliation.

(Second Amended Complaint at ¶ 36) (emphasis in original). Plaintiff alleges further that, on July 3, 2006, Defendant indefinitely suspended him "citing his intent to seek redress with the U.S. Department of Labor and U.S. Department of Health and Human Services, etc."[6]   (*Id.* at ¶ 38). However, contrary to Plaintiff's assertion, Defendant did not cite Plaintiff's "intent to seek redress" as a reason for his suspension. (*See* Defendant's Supplemental Motion, Ex. 1 at 8–11). In fact, Defendant has submitted substantial evidence to show that its decision to terminate Plaintiff was not influenced by his complaint to the Department of Labor, but was based entirely

---

[6] Only Plaintiff's complaint to the U.S. Department of Labor is relevant to his whistleblower claim, as the Act clearly requires that the employee *actually report a violation* to maintain a claim. Tex. Gov't Code Ann. § 554.002(a) ("a public employee who in good faith reports a violation of law by the employing governmental entity...") (emphasis added).

on his multiple acts of insubordination toward his supervisors. (*See id.*). In response, Plaintiff has not submitted any evidence to show that his termination was based on anything other than his own conduct. Because Plaintiff has failed to raise a fact issue on whether he was fired in retaliation for his complaint to the Department of Labor, Defendant is entitled to summary judgment on this claim.

**CONCLUSION**

Accordingly, it is **RECOMMENDED** that Defendant's Motion for Summary Judgment be **GRANTED**, and that Plaintiff's Motion for Summary Judgment be **DENIED**.

The Clerk of the Court shall send copies of the memorandum and recommendation to the respective parties, who will then have ten (10) days from the receipt of it to file written objections thereto, pursuant to 28 U.S.C. § 636(b)(1)(c), General Order 02-13, S.D. Texas. Failure to file written objections within the time period provided will bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas 77208; copies of any such objections shall be delivered to the chambers of Judge Lee H. Rosenthal, Room 11535, **and** to the chambers of the undersigned, Room 7007.

**SIGNED** at Houston, Texas, this 18th day of June, 2008.

_____
**MARY MILLOY**
**UNITED STATES MAGISTRATE JUDGE**